1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

**WESTERN DIVISION**

11

12  JOSEPH A. GAY,                      )      No. ED CV 05-199-PLA
                                        )
13            Plaintiff,                )
                                        )
14      v.                              )      **MEMORANDUM OPINION AND ORDER**
                                        )
15  JO ANNE B. BARNHART,                )
    COMMISSIONER OF SOCIAL             )
16  SECURITY ADMINISTRATION,            )
                                        )
17            Defendant.                )
                                        )
    _____)

18

19                                    **I.**

20                              **PROCEEDINGS**

21      Plaintiff filed this action on March 18, 2005, seeking review of the Commissioner's denial

22  of his application for Supplemental Security Income benefits.  The parties filed a Consent to

23  proceed before the undersigned Magistrate Judge on April 18, 2005.  Pursuant to the Court's

24  Order, the parties filed a Joint Stipulation on December 9, 2005, that addresses their positions

25  concerning the disputed issues in the case.  The Court has taken the Joint Stipulation under

26  submission without oral argument.

27  /

28  /

## II.

## BACKGROUND

Plaintiff was born on June 10, 1974. [Administrative Record ("AR") at 38.] He has an eleventh grade education,[1] and past work experience as a truck and car washer. [AR at 53, 58, 91.]

On November 16, 2000, plaintiff protectively submitted a claim for Supplemental Security Income benefits. [AR at 38-41.] Plaintiff alleged disability due to an inability to read, panic attacks and depression. [AR at 38, 52.] Plaintiff claimed that he has been unable to work since July 1, 1999. [AR at 38.] After his application was denied initially and on reconsideration, a hearing before an Administrative Law Judge ("ALJ") was held on October 17, 2002. Plaintiff appeared with counsel and testified on his own behalf. Testimony was also elicited from plaintiff's mother, a medical expert and a vocational expert. [AR at 160-78.] On November 15, 2002, the ALJ concluded that plaintiff was not disabled and thus not entitled to Supplemental Security Income benefits. [AR at 11-22.] When the Appeals Council denied review on June 26, 2003, the ALJ's decision became the final decision of the Commissioner. [AR at 3-5.]

On July 9, 2004, in case no. ED CV 03-867-PLA, this Court remanded the matter back to the Commissioner for further proceedings, based on the finding that the ALJ improperly rejected the opinions of plaintiff's treating physician and therapist. [AR at 253-66.] A new hearing was held on November 15, 2004, at which plaintiff appeared with counsel and testified on his own behalf. Testimony was also received from a vocational expert, a medical expert, and a lay witness. [AR at 310-31.] On December 22, 2004, the ALJ concluded that plaintiff is not disabled, and not entitled to Supplemental Security Income payments. [AR at 185-94.]

/

/

/

/

---

[1] Plaintiff testified in 2002 that he stopped attending school in the ninth grade. [AR at 165.]

### III.

### STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance -- it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion."  Moncada, 60 F.3d at 523; see also Drouin, 966 F.2d at 1257.  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence.  Drouin, 966 F.2d at 1257; Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  Where the evidence is susceptible to more than one rational interpretation, the Court must defer to the decision of the Commissioner.  Moncada, 60 F.3d at 523; Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995); Drouin, 966 F.2d at 1258.

### IV.

### THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving social security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin, 966 F.2d at 1257.

### A.     THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995, as amended April 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the

1   claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

2   substantial gainful activity, the second step requires the Commissioner to determine whether the

3   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

4   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

5   If the claimant has a "severe" impairment or combination of impairments, the third step requires

6   the Commissioner to determine whether the impairment or combination of impairments meets or

7   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404,

8   Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.

9   If the claimant's impairment or combination of impairments does not meet or equal an impairment

10  in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

11  sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled

12  and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform

13  past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

14  case of disability is established.  The Commissioner then bears the burden of establishing that

15  the claimant is not disabled, because he can perform other substantial gainful work available in

16  the national economy; the determination of this issue comprises the fifth and final step in the

17  sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966

18  F.2d at 1257.

19

20  **B.      THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

21        In this case, the ALJ found after the second hearing that plaintiff has not engaged in

22  substantial gainful activity since the alleged onset of disability (step one).  [AR at 186, 193.]  At

23  step two, the ALJ concluded that plaintiff has the severe impairments of a depressive disorder,

24  not otherwise specified, personality disorder, not otherwise specified, and low average to

25  borderline intelligence. [AR at 188, 193.] At step three, the ALJ found that plaintiff's impairments

26  do not meet or equal the requirements of any of the impairments in the Listing.  Id.  The ALJ

27

28

1  further found that plaintiff has the residual functional capacity² to perform work activities at any

2  exertional level, but limited to work "consisting of moderately complex tasks with up to 4 steps of

3  instructions in a habituated setting with preclusions from the following: demands for intense

4  interpersonal interactions, responsibility or use of safety equipment, fast moving machinery, and

5  more than simple reading." [AR at 188-89, 193.]  The ALJ concluded that plaintiff was unable to

6  perform his past relevant work (step four), but, at step five, found that he retains the capacity to

7  perform other work that exists in significant numbers in the regional and national economies. [AR

8  at 192.]  Therefore, the ALJ found plaintiff not disabled. [AR at 186, 193-94.]

9

10                                                      **V.**

11                                          **THE ALJ'S DECISION**

12          Plaintiff contends that the ALJ: 1. improperly rejected the opinion of his treating physician,

13  and 2. improperly rejected the testimony of his lay witness.  For the reasons discussed below, the

14  Court respectfully disagrees with plaintiff, and affirms the Commissioner's decision.

15

16  **A.      EVIDENCE FROM THE FIRST DECISION**

17          At the time of the first hearing, plaintiff was 27 years old. [AR at 38, 160.] He last worked

18  in 1999 at a car dealership, from which he was fired for being tardy and not getting along with the

19  people that worked there. [AR at 163-64.] He lived with his three children and his girlfriend. [AR

20  at 164.] Plaintiff stopped going to school in the ninth grade, and he never received a GED.  He

21  has trouble reading and writing; he reads and writes at about the fourth grade level. [AR at 165.]

22  Although he does not read well, he tries to help his kids, who are in elementary school, with their

23  homework. [AR at 166.] Plaintiff last used marijuana about four or five months before the hearing,

24  and at that time was using approximately twice a week.  He occasionally drinks beer, but cut back

25  after he started taking medications. [AR at 167-68.]

26

27
          ² Residual functional capacity is what a claimant can still do despite existing exertional and
28  nonexertional limitations.  Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1    Plaintiff testified that he is afraid all of the time, and has crying spells when he is feeling

2    down and depressed.  This occurs approximately once a week.  He daily feels like people are out

3    to get him. [AR at 172.] He has problems sleeping, and sleeps during the day time but is up at

4    night. [AR at 172.] He is irritable and easily frustrated, and has problems concentrating and

5    finishing things.  Plaintiff's mind "jumps from one thing to another to another to another." [AR at

6    172-73.]  He does not like people being around him, and does not like being in social situations.

7    [AR at 173.]

8    The medical expert testified that plaintiff has the medically determinable impairments of

9    depressive disorder, not otherwise specified, and a substance addiction disorder to some extent.

10   [AR at 168.] The expert noted that plaintiff was diagnosed with a reading problem and dyscalculia,

11   which is "problems with arithmetic."  He further noted that "simple two or three steps would be all

12   right" in a work setting, but that plaintiff would have to be trained by direction or mimicry. [AR at

13   169.] He also indicated that plaintiff would meet certain criteria for depression. [AR at 170.] He

14   further testified that there is no indication in the file of a personality disorder, which was "a little

15   surprising." The only diagnoses were variations on "some kind of depression along with variations

16   of some sort of reading disorder."  In order to determine if plaintiff had a personality disorder, it

17   would be necessary to conduct testing.  Such a disorder would cause more difficulties with social

18   functioning in the work environment, as plaintiff would not get along as well with peers and

19   supervisors. [AR at 171.]

20   The vocational expert was presented with a hypothetical of an individual who is 28 years

21   old, with a ninth grade education, who is only marginally literate.  His reading skills are at a second

22   grade level, and math is at a third grade level.  He cannot do any work that requires any real

23   literacy.  The individual can follow two to three step instructions at most, but needs to be trained

24   by mimicry.  He should work around a limited number of people with no interpersonal interactions.

25   The vocational expert testified that such an individual could not perform plaintiff's past relevant

26   work, but could perform cleaner positions, which are available in the regional and national

27   economies. [AR at 174-75.]

28

1     Plaintiff's mother testified that she talks to plaintiff every day and that from her observations

2  of plaintiff, he has problems with depression.  He has difficulties being around people, and has

3  always had problems concentrating and finishing things.  He is also irritable and frustrated. [AR

4  at 176-77.]

5     Plaintiff was admitted to the Desert Valley Hospital in January, 2000, where he complained

6  of stress and feeling depressed.  He was placed on Prozac, and was counseled to increase his

7  exercise, to think positive and to obtain employment.  His condition was labeled as "good." [AR

8  at 93-99.]

9     Plaintiff was seen at the Victor Valley Community Hospital in June, 2000, also for

10  depression and sadness.  He was not suicidal, and was not hearing voices.  He was not at that

11  time using Prozac or any medication. [AR at 101-05.]

12     A complete psychological evaluation, including testing, was performed by Dr. Nick

13  Andonov, a clinical psychologist, on December 1, 2000.  Plaintiff indicated that he would gladly

14  go back to his last job doing detail work at a truck stop.  Plaintiff "cried excessively" while talking

15  about his twin brother who is in prison, and the fidelity of his girlfriend.  He was easily distracted,

16  and his cognition was limited due to very poor education. His mood was depressed, and his affect

17  was sad.  His suicidal thoughts were controlled because of his children.  Plaintiff discontinued

18  using Prozac because it made him more depressed, which Dr. Andonov notes is "rather unusual"

19  as Prozac is an anti-depressant.  He was diagnosed with learning disorders, depressive disorder

20  not otherwise specified, personality disorder with paranoid features, and a "GAF" score of 55.[3]

21  Dr. Andonov concluded that plaintiff understands simple instructions and is cooperative with

22  others.  [AR at 108-11.]

23

24  _____

25     [3]   A Global Assessment of Functioning ("GAF") score is the clinician's judgment of the
   individual's overall level of functioning.  It is rated with respect only to psychological, social, and
26  occupational   functioning, without regard to impairments in functioning due to physical or
   environmental limitations.  See American Psychiatric Association, Diagnostic and Statistical
27  Manual of Mental Disorders ("DSM-IV"), at p. 32 (4th Ed. 2000).  A GAF score from 51-60
   indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.
28  Id. at p. 34.

1    Plaintiff was seen at Family Practice Associates in March 2000, March 2001, and April

2    2001.  He was diagnosed with major depression and social phobia disorder; he was prescribed

3    medications. [AR at 113-19.]

4    A psychiatric evaluation was performed on plaintiff on June 17, 2001, by Dr. Ernest Bagner,

5    a psychiatrist resident.  Plaintiff reported being depressed with crying spells and anxiety since

6    1998.  He told Dr. Bagner that he has difficulty with concentration and memory, and has daily

7    panic attacks.  He denied suicidal or homicidal ideation, and said that he sleeps well but does not

8    have a good appetite.  He was taking Prozac at the time of his examination.  Following the

9    examination, Dr. Bagner diagnosed plaintiff with depressive disorder not otherwise specified, and

10   a current GAF score of 65.[4]  He opined that plaintiff would "most likely be able to interact with a

11   supervisor.  He was able to carry out simple three-part commands and would likely be able to

12   carry out repetitive tasks.  He would be able to handle the stress inherent in the work environment

13   and work with peers and the public.  He would be able to attend work on a regular basis." [AR at

14   121-24.]

15   A state agency physician concluded that plaintiff suffers from depression, not otherwise

16   specified, that he is mildly restricted in his activities of daily living, has mild difficulties in

17   maintaining social functioning, and moderate difficulties in maintaining concentration, persistence

18   or pace. [AR at 137.] He was also found to be moderately limited in his ability to understand and

19   remember detailed instructions, and in his ability to carry out detailed instructions. [AR at 141.]

20   On September 13, 2001, plaintiff was evaluated at the Department of Behavioral Health

21   in San Bernardino.  Plaintiff indicated that he had been experiencing sadness, weight fluctuation,

22   insomnia, anxiousness and lack of concentration, bouts of anger and crying since 1994.  He was

23   taking Prozac on a daily basis.  His mood was depressed, and he was sad and crying.  Upon

24   intake, he was assessed as having a "severe" dysfunction rating, which was based on the

25

26
27
28
     [4]   A GAF score from 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV, at p. 34.

1 conclusion that he "can't hold a job sad crying lack of interest in daily [sic]." [AR at 157.] Plaintiff

2 was referred for a medical evaluation with Dr. Denise Dittemore, who diagnosed him with major

3 depression and a reading disorder, and assigned him a GAF score of 50.[5] [AR at 152-58.] Dr.

4 Dittmore prescribed medications for plaintiff for approximately one year, through August, 2002.

5 [AR at 159.]  His medications were adjusted during various visits to this facility. [AR at 145-48.]

6

7 **B.    EVIDENCE FROM THE SECOND DECISION**

8         The records since the first decision indicate that plaintiff has continued to receive

9 medication on a regular basis since August, 2002. [AR at 286-90.] Since at least September 2002,

10 plaintiff has been treated by Dr. Jeremiah Umakanthan for depression and psychosis.  Although

11 plaintiff displayed paranoid thinking, Dr. Umakanthan initially found plaintiff to be "pleasant" and

12 "friendly."  He adjusted plaintiff's medications. [AR at 306.]  In April, 2003, Dr. Umakanthan noted

13 that plaintiff was "improving." [AR at 303.] No change was noted in plaintiff's condition and his

14 medications were adjusted in August, 2003. [AR at 301.] In November, 2003, although there was

15 no change in plaintiff's psychosis or depression, plaintiff did not want any adjustment to his

16 medications at that time.  [AR at 299.]  On December 16, 2003, Dr. Umakanthan noted that there

17 was no change in plaintiff's depression. [AR at 298.] He reported that he was "doing fine" in

18 March, 2004.  Dr. Umakanthan indicated that his improvement was positive. [AR at 294.] On April

19 6, 2004, plaintiff failed to appear for an appointment with Dr. Umakanthan, later indicating that he

20 forgot about the appointment but was "doing okay." [AR at 293.]

21         On November 12, 2004, Dr. Umakanthan completed a Mental Impairment Questionnaire,

22 indicating the following: plaintiff's impairment has lasted or can be expected to last at least 12

23 months; plaintiff's impairment would cause him to be absent from work more than 3 times a

24 month; plaintiff would have difficulty working at a regular job on a sustained basis; he has marked

25 (<u>i.e.</u>, more than moderate, but less than extreme) limitations on his activities of daily living,

26

27     [5]   A rating of 41-50 on the GAF scale indicates "[s]erious symptoms (e.g., suicidal ideation,
severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational,
28 or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV, at p. 34.

1    extreme difficulty in maintaining social functioning, marked episodes of deterioration or

2    decompensation in work or work-like settings, and would often have limitations and deficiencies

3    of concentration, persistence or pace; he also has marked limitations (i.e., serious) or extreme

4    limitations (i.e., severe with no useful ability to function) in his ability to remember locations and

5    work-like procedures, to maintain attention and concentration for extended periods, to work in

6    coordination with or in proximity to others without being distracted by them, to make simple work-

7    related decisions, to interact appropriately with the general public, to get along with co-workers

8    or peers, to maintain socially appropriate behavior and adhere to basic standards of neatness and

9    cleanliness, and to respond appropriately to changes in the work setting. [AR at 307-09.]

10          Plaintiff testified at the November 15, 2004, hearing that he was not working at that time

11   and could not remember the last time he did work. [AR at 313.] Plaintiff had no recollection of

12   working with any employer in 2001, even though it appeared he had some earnings in that year.

13   [AR at 313-14.]  Plaintiff further indicated that he sees "Dr. Jerry," a psychiatrist, "every month or

14   something like that."  He gives him medication for his depression, but he does not think that it

15   helps. [AR at 319-20.] Plaintiff fears that people are out to get him, hurt him, or are talking about

16   him. [AR at 326.] He also indicated that he feels claustrophobic on occasion, and has problems

17   feeling panicky or nervous in social situations. [AR at 327.]  Plaintiff testified that he does not

18   remember having a DUI in the past. [AR at 317.]

19          Dr. Joseph Malancharuvil, a medical expert, testified that plaintiff has a depressive

20   disorder, not otherwise specified, a personality disorder, not otherwise specified, no limitations on

21   his activities of daily living, mild to moderate limitations on social functioning, and mild limitations

22   on "cognitive disruption," persistence or pace.  He concluded that plaintiff is "functionally limited

23   to moderately complex tasks up to four-step instructions . . . In a habituative setting, no demand

24   for intense interpersonal interactions.  He should not operate safety related equipment or fast

25   moving  machinery because of potential seizures, which are controlled well by medications.  He

26   should not have to read and assimilate complex written instructions," and verbal instructions

27   should also be relatively simple.  Plaintiff's intellectual abilities are in the low average to borderline

28   range. [AR at 316.]

1    Dr. Malancharuvil further testified that he did not know the objective basis for the marked

2    restrictions of activities of daily living opined by Dr. Umakanthan, as "there is no evidence

3    whatsoever that he has any problems of daily activities of living." There is also no evidence of

4    extreme social functioning limitations, as plaintiff is not completely paralyzed or living in an in-

5    patient setting, and the extreme ratings are not consistent with the tasks of being able to live at

6    home. [AR at 318.] Dr. Umakanthan also indicated that plaintiff has a tendency to exaggerate

7    some of his emotional issues, but he did not think that it is a malingering issue. [AR at 319.]

8    As to Dr. Dittmore's GAF score of 50, Dr. Malancharuvil indicated that this score "does not

9    preclude function," and that it is not clear how long that evaluation lasted or the basis for it.  He

10   further indicated that plaintiff being "well-groomed, casually dressed" and "passively cooperate"

11   for an examination with good eye contact and normal speech with no thought problems is not

12   consistent with a GAF score of 50. [AR at 151, 322-23.]

13   Petitioner's mother testified that she sees her son almost every day, that he has problems

14   being around people, has no friends, stays shut up in the house, has problems finishing things

15   he starts, claims he sees people talking about him, and talks to "little animals." [AR at 328-29.]

16

17   **C.    TREATING PHYSICIAN OPINION**

18   Plaintiff contends that the ALJ improperly rejected the opinion of Dr. Jeremiah Umakanthan

19   that plaintiff would have difficulty working at a regular job on a sustained basis.

20   The ALJ rejected the forms completed by Dr. Umakanthan in November, 2004, noting that

21   the "check-box" reports "do not contain any explanation or supporting rationale for the

22   conclusions." [AR at 190.] He found that Dr. Umakanthan's treatment notes "do not support such

23   egregious limitations without comment." Id.  Further, there was no evidence that plaintiff was not

24   medically compliant, no evidence he was "unkempt," and nothing to show he has "deficiencies of

25   concentration, persistence or pace."  Id.

26   Plaintiff points to evidence in the record that he contends shows significant difficulties in

27   social functioning and the ability to concentrate, including Dr. Umakanthan's reports of plaintiff's

28   belief that people are talking about him [AR at 292, 294, 299, 300], that he has "social anxiety"

11

1  [AR at 302] and displays evidence of psychotic processes, including auditory hallucinations [AR

2  at 292, 300, 301], and the fact that plaintiff was receiving Risperdal for psychosis. [AR at 300,

3  302.]

4          In evaluating medical opinions, the case law and regulations distinguish among three types

5  of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but

6  do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the

7  claimant (non-examining physicians).  See 20 C.F.R. §§ 404.1502, 416.927;  Lester, 81 F.3d at

8  830.  As a general rule, more weight should be given to the opinion of a treating physician than

9  to the opinions of doctors who do not treat the plaintiff.  Lester, 81 F.3d at 830; see also Smolen

10 v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996) ("Because treating physicians are employed to cure

11 and thus have a greater opportunity to know and observe the patient as an individual, their

12 opinions are given greater weight than the opinions of other physicians.").

13         "'The administrative law judge is not bound by the uncontroverted opinions of the claimant's

14 physicians on the ultimate issue of disability, but he cannot reject them without presenting clear

15 and convincing reasons for doing so.'"  Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)

16 (quoting Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (quoting Montijo v. Secretary of

17 Health & Human Servs., 729 F.2d 599, 601 (9th Cir. 1984)); see also Lester, 81 F.3d at 830.

18 Even if a treating physician's opinion on disability is controverted, it can be rejected only with

19 specific and legitimate reasons supported by substantial evidence in the record.  Lester, 81 F.3d

20 at 830.

21         Defendant argues that the ALJ appropriately rejected Dr. Umakanthan's reports, as they

22 are not supported by clinical findings and are brief and conclusory.  An ALJ need not accept a

23 treating physician's opinion that is "brief and conclusionary in form with little in the way of clinical

24 findings to support [its] conclusions."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989)

25 (quoting Young v. Heckler, 803 F.2d 963, 968 (9th Cir.1986)); Johnson v. Shalala, 60 F.3d 1428,

26 1432 (9th Cir. 1995)  (the ALJ need not accept a treating physician's opinion which is "conclusory

27 and unsubstantiated by relevant medical documentation"); Matney v. Sullivan, 981 F.2d 1016,

28 1019 (9th Cir. 1992) (ALJ may reject the conclusory opinion of an examining or treating physician

1   if the opinion is unsupported by clinical findings).  Here, the ALJ correctly concluded that the

2   information contained in Dr. Umakanthan's treatment records does not support the limitations

3   arrived at in his check-box reports.   While Dr. Umakanthan consistently notes plaintiff's

4   depression and psychosis, his notes do not reflect any marked or extreme difficulties that plaintiff

5   would have with concentration, persistence or pace, or in adhering to standards of neatness.

6   Instead, Dr. Umakanthan noted that plaintiff was doing "fine" when his wife administered his

7   medications, that his medications were resulting in a decrease in his mood swings and he at times

8   was not having hallucinations. [AR at 294.] Even when plaintiff was exhibiting paranoid thinking,

9   he was still described as pleasant and friendly.  The ALJ properly found that plaintiff had "little or

10  no impairment" when taking his medications as prescribed. [AR at 191.]

11          Further, the ALJ's conclusion that Dr. Umakanthan's conclusions were extreme is

12  supported by the testimony of Dr. Malancharuvil.  The opinions of a non-examining, testifying

13  medical advisor such as Dr. Malancharuvil "may serve as substantial evidence when they are

14  supported by other evidence in the record and are consistent with it."  Morgan v. Commissioner

15  of Social Security Admin., 169 F.3d 595, 600 (9th Cir. 1999) (quoting Andrews v. Shalala, 53 F.3d

16  1035, 1041 (9th Cir. 1995)).  When such a medical advisor is relied upon, the ALJ must set out

17  a "detailed and thorough summary of the facts and conflicting clinical evidence, stating his

18  interpretation thereof, and making findings."  Morgan, 169 F.3d at 600-01, quoting Magallanes,

19  881 F.2d at 750.  Dr. Malancharuvil testified that he saw no objective basis for Dr. Umakanthan's

20  opinion that plaintiff has extreme problems with activities of daily living or with social functioning --

21  i.e., that he is completely paralyzed and is in or has to be in an in-patient setting [AR at 318] -- as

22  that assessment is inconsistent with plaintiff living at home with his girlfriend and children.

23  Further, the ALJ noted that Dr. Umakanthan commented that plaintiff was doing "fine" when his

24  wife was administering his medication, that difficulties arose when he was not medically compliant,

25  and he would have little or no impairment if he took his medications as prescribed. [AR at 191.]

26   Dr. Malancharuvil's opinion was supported by the evidence in the record, and the ALJ presented

27  specific and legitimate reasons to reject the assessment of plaintiff's treating physician.  Remand

28  is not warranted.

13

1 **D.    LAY WITNESS TESTIMONY**

2        Plaintiff contends that the ALJ improperly rejected his mother's testimony. Lay witness

3 testimony is "qualified evidence" that the ALJ must consider.  See Sprague v. Bowen, 812 F.2d

4 1226, 1231-32 (9th Cir. 1987); Smolen, 80 F.3d at 1289 (testimony from lay witnesses, who see

5 the plaintiff on a daily basis and are often family members, is of noted value); Dodrill v. Shalala,

6 12 F.3d 915, 919 (9th Cir. 1993) ("[a]n eyewitness can often tell whether someone is suffering or

7 merely malingering . . . this is particularly true of witnesses who view the claimant on a daily basis.

8 . .").  An ALJ may reject lay testimony only for specific reasons germane to each witness.  See

9 Regennitter v. Commissioner of the Soc. Sec. Admin., 166 F.3d 1294, 1298 (9th Cir. 1999);

10 Smolen, 80 F.3d at 1289.

11       Here, the ALJ provided reasons to reject the testimony of plaintiff's mother that were

12 germane to the witness.  He found that plaintiff's mother's testimony was inconsistent with the

13 evidence and with plaintiff's own testimony. [AR at 191-92.]  First, the medical expert testified that

14 the mother's testimony did not alter his opinion that there was no evidence that plaintiff is socially

15 paralyzed.[6]  [AR at 318, 329.]  The ALJ correctly noted that plaintiff attends his monthly session

16 with his psychiatrist, lives with his girlfriend and three children, and sees his mother regularly. [AR

17 at 192.]  Further, plaintiff himself testified to his ability to live with his girlfriend and three children,

18 and did not testify to any visual hallucinations.  Indeed, plaintiff has pointed to no evidence in the

19 record to support a claim of such hallucinations.  The reasons given by the ALJ to reject plaintiff's

20 mother's testimony are thus specific and germane, and remand is not warranted.

21 /

22 /

23 /

24 /

25

26     [6]    The medical expert also testified that there is no evidence that plaintiff is being treated for
a psychotic disorder. [AR at 329.] It appears that plaintiff has been diagnosed by Dr. Umakanthan
27 with psychosis and has received medication for this condition for years. However, the ALJ did not
cite the lack of treatment for psychosis as a basis to adopt Dr. Malancharuvil's testimony. [AR at
28 192.]

1

## VI.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that: 1. plaintiff's request for reversal, or in the alternative, remand, is **denied**; and  2. the decision of the Commissioner is **affirmed**.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.


DATED: February 7, 2006
                                                            /S/
                                                    PAUL L. ABRAMS
                                        UNITED STATES MAGISTRATE JUDGE